DARCEY & WHEELER v. BOURBON SHOTWELL et al.

1. CONFEDERATE MONEY—RULE OF EVIDENCE.—Under the act of February 19, 1867, "to change the rule of evidence in certain cases," all contracts made between May 1, 1862, and May 1, 1865, for the payment of money shall be presumed to have intended "Confederate money," unless the contrary appear on the face of the contract. Where a note was given for Confederate money, borrowed from plaintiff on the 2d day of June, 1862, payable on the 1st day of March, 1864, "payable in such money, currency, or funds as will be generally received for debts in this country at maturity of this note." Held: To be error to instruct the jury, directing the value of Confederate money to be ascertained at the maturity of the note. The correct measure of recovery is the value of Confederate money at the time of the loan. This is founded in reason and justice.

2. SAME—CONTRACT.—Without the stipulation as to the currency in which it was payable, the note would have been payable in the funds or currency generally received in payment of debts at the date of its maturity, precisely according to its present conditions, and the contract between the parties is the same, with or without the stipulation.

Error from the circuit court of Hinds county. Hon. GEO. F. BROWN, Judge.

The facts in the case are very fully stated in the opinion of the court.

*Geo. L. Potter*, for plaintiff in error.

*C. E. Hooker*, for defendant in error.

Reporters find no briefs in this case.

TARBELL, J., delivered the opinion of the court:

This is an action upon a note of which the following is a copy:

$1,140.00.                     JACKSON, MISS., 2d June, 1862.

On or before the first day of March, 1864, we promise to pay to Darcey & Wheeler, or order, $1,140.00, for value received, same being for money loaned, with eight per cent. interest after maturity, until paid, payable in such money, currency, or funds as will be generally received for debts in this country, at maturity of this note.

(Signed)                     R. & B. SHOTWELL.

Defendants filed the usual plea of *non-assumpsit*, with notice of evidence to prove the note payable in Confederate money.

Several witnesses were examined upon the question whether Confederate money was generally received for debts at the date of the maturity of the note.

. There was an attempt on the part of the plaintiffs in the action, to show a distinction between debts created before and during the war, and that Confederate money was not received in payment of the former, nor, in fact, in all cases for the latter, at the date of the maturity of this note, March 1, 1864.

To a question calling for the conversation between the makers of this note and the agent of plaintiffs in the transaction, the plaintiffs objected, and excepted to the ruling of the court in allowing the testimony to be given. The substance of the answer to this question was, that before the execution of the note, and after it was drawn, Robt. Shotwell said to the plaintiff's agent, " Suppose this note was due now, in what currency would it be payable?" To this plaintiff's agent replied, "In Confederate money."

To the testimony of Robt. Shotwell on this point, the same objection was made, and exception taken, on the ground that no evidence could be given to vary or explain the terms of a written contract.

The plaintiffs offered to prove the custom of the witness, Allen, as to the receipt of Confederate money in payment of debts, but the objection thereto by the defendants was sustained by the court, on the ground that it was proof of individual, and not of general custom, and plaintiffs excepted.

The evidence went to show that many were quite unwilling to receive Confederate money for debts about the time this note fell due, yet, in fact, debts were generally paid in this currency, which was generally received, though with dislike, but there was no other currency save of certain State bank notes, to a limited extent. Debts contracted before the war, were also paid in the same currency, though

there was a disposition on the part of this class of creditors to extend the time of payment of these debts to avoid the acceptance of this money, then greatly depreciated, and to await future events, except when the debtor was failing, when anything was accepted as better than delay, with certain prospect of total loss of the debt.

There was evidence of an offer to pay the note before its maturity, but this was declined or waived, partly because the currency was objectionable, and partly for want of authority in the agent, to whom the offer was made, to receive pay. There was no money actually produced and tendered. The note was given for Confederate money loaned to the Shotwells by plaintiffs, Darcey & Wheeler, through Allen, as their agent, on the day it bears date.

The instructions on the part of the plaintiffs in the action, submit the case to the jury upon the theory that the currency in which the note was payable, by its terms, was that which creditors were " willing" to receive in payment of debts at that date, and not the currency in which debts were, in fact, generally paid.

On the part of the defense, the first instruction advised the jury that the note was *prima facie* payable in Confederate money, and they should so find, unless the contrary appears on the face of the note or in the evidence on the trial.

The third and last instruction for defendants, presented to the jury the proposition that if, at the date of the maturity of the note, Confederate money was generally received in payment of debts in this country, when the note sued on was made payable, then the plaintiffs can recover only the value of such currency at that date.

At the maturity of the note, Confederate currency was valued at 20 for 1, or one dollar in gold was worth twenty in Confederate money, according to one witness, and in the language of another, the latter was worth only five cents on the dollar.

The note bears 8 per cent. interest after maturity. The

trial was in 1871. Verdict for plaintiffs for $177, or about one seventh the face of the note. A motion for a new trial, made by plaintiffs in the action, was overruled, and hence a writ of error by the latter.

The assignments of error are based: 1. On overruling the motion for a new trial. 2. On the instructions for defendants. 3. On the ground of conflict in the instructions for plaintiffs and for defendants. 4. On objections and exceptions to the evidence of Smyth and Shotwell as to the conversation between the agent of plaintiffs and Shotwell at the time of executing the note. 5. On the exclusion of the evidence of Allen as to his own action in accepting or refusing Confederate money in payment of debts due him.

The motion for a new trial stated these grounds therefor: 1. The verdict is contrary to law and evidence, and to the instructions of the court. 2. The verdict is for less than the plaintiffs are entitled to recover. 3. The instructions for defendants were erroneous. 4. Error in admitting evidence for defendants and in excluding evidence for plaintiffs. 5. Conflict of instructions.

Thus is given a very full synopsis of this case, and it will be seen that its solution involves the determination of the question of the time when the value of the currency in which the note was payable should be ascertained, whether at its date, or at its maturity; or, more correctly, the question to be solved, is, what damages are the plaintiffs entitled to on the facts?

In searching for the basis of the verdict, some difficulty has been met with. Confederate money was shown by the witnesses to be worth on March 1, 1864, only five cents on the dollar. At this rate, the note was worth in gold, at that time, only $57. This sum, at the trial, with interest at 8 per cent. would amount to about $95. Referring to the evidence of Mr. Shotwell, however, he says he offered to pay the note in South Carolina bank notes, worth two or three times as much as Confederate treasury notes. If, then, ten per cent. be allowed for the note, which is double the value of

Confederate money, the note was worth, in good money, on March 1, 1864, $114. The interest on this sum, at 8 per cent. to the time of trial, would be $63.84, and the principal and interest would amount to $177.84, calling the time seven years. It, in fact, wanted only 1 month and 14 days of that full time. Mr. Allen, the agent of plaintiffs, in his testimony, states, that, when Mr. Shotwell offered to pay the note in the notes of the State banks of South Carolina, he said, he did not like to offer payment in Confederate treasury notes, because of their great depreciation. This was a few days prior to the maturity of the note. Thus, the action of the jury and their calculations, may be presumed. For $1140, on the 2d day of June, 1862, worth then, probably, about one half that sum in gold, the plaintiffs are awarded $177. Suppose this note had been given for personal property, such as horses, provisions, merchandise, etc., what would be the true measure of recovery? Justice would require a judgment for the actual value of the property at the time and place of the contract. At that time Confederate money represented value. It paid debts. It was received in exchange for all kinds of property. It was the currency of this section of country. To the parties to this controversy it represented some certain value capable of ascertainment, to which extent it was beneficial to them. At the time of the loan, the plaintiffs parted with this value, and the defendants received the same. At the maturity of the note, this money had ceased to be of any substantial value. Ought the plaintiffs to be the losers by this depreciation and the defendants the gainers by the plaintiffs loss, or will justice be best subserved by paying the plaintiffs the actual value with which they parted, and to which extent the defendants were benefited?

Take another view. The note is payable "in such money, currency, or funds as will be generally received for debts in this country at maturity of this note." Such money, currency or funds," *might* have been gold, U. S. treasury notes, or other valuable money. It was not, therefore, absolutely,

a note payable in Confederate currency. There was a chance, that at the maturity of the note, some other than Confederate treasury notes would constitute the "money, currency or funds" generally received for debts in this section.

Turning now to the instructions; the first for the defendants, instructed the jury that the note was *prima facie* payable in Confederate treasury notes, and they would so find, unless the contrary appears on the face of the contract, on evidence offered on the trial. The third was to the effect, that the jury could only find the value of Confederate currency at the date of the maturity of the note.

If correct in the view above suggested, the court erred in its construction of the terms of the contract. It, in fact, provided for contingencies, and speculative events. The conclusion of the war prior to March 1, 1864, would have produced a currency quite unlike that in circulation at the date named, and yet, the terms of the note provided for such a result. If, then, the currency at the maturity of the note had been gold or U. S. treasury notes, it will not be contended that the plaintiffs would be entitled to the full face of the note in this latter and better money. Were this so, they would thus receive two or three times the value of the money loaned.

The conclusion reached, is, that the instructions contain two errors. One, in not giving the correct legal construction to the contract; and the other, in directing the value of Confederate money to be ascertained at the maturity of the note, as the measure of damages to which the plaintiffs would be entitled, rather than at its date.

That the correct measure of recovery in this case, is, the value of Confederate money at the date of the loan, is believed to be founded in reason and justice. It is in accordance with a direct declaration of opinion by this court in Gray v. Harris, 43 Miss., 429; item 4; and repeated in Cowan v. McCutchen, ib., 207. And, as understood, Thorington v. Smith, 8 Wal. 1, declares the same rule. The second

question in that case was, "Can evidence be received to prove that a promise expressed to be for the payment of dollars was, in fact, made for the payment of any other than lawful dollars of the United States? In answering this question, the court say: "We are clearly of opinion that such evidence must be received in respect to such contracts, in order that justice may be done between the parties, and that the party entitled to be paid in these Confederate dollars can recover their actual value at the *time and place* of the contract, in lawful money of the United States."

Judgment reversed and cause remanded.

A petition for re-argument was filed, which was granted. The case was re-argued by same counsel as before.

TARBELL, J., delivered the opinion of the court on the re-argument:

Petition for re-argument. The sole point submitted in support of the petition is, that by the very terms of the note sued on, the parties thereto had themselves contracted, in writing, and agreed on the currency or funds in which the note was to be paid, and it is urged that the judgment ignores this written contract of the parties.

This class of cases grow out of the anomalous condition of the country from 1861 to 1865. They are wholly unusual and exceptional. In their adjustment a just and equitable basis has been sought both by legislatures and the courts. Any other result in the case at bar would have been unjust. When the note was made, it was agreed, that if instantly payable, it would be payable in Confederate money, then worth only two or three for one of gold. At its maturity, there was a difference of twenty or thirty for one. And when the makers tendered payment in the notes of State banks, it was with an apology and regrets, for the great depreciation in their value. We do not understand this to be a gambling note, or, perhaps more properly, a note of chances and risks, by which, under some circumstances, it

might be payable absolutely in gold or greenbacks; or, under other circumstances, that it could be discharged by worthless "shin-plasters," as it is conceived, would result from a literal reading of its terms. On the contrary, it is believed that its special provision, as to the funds in which it was payable, was inserted to prevent the result suggested. And it comes back to this, that this special provision was inserted to secure a fair, just result, and to prevent an unequal, unjust termination to the transaction. As understood, this provision simply states what would have been the legal terms of the note without it. In other words, that without this clause, the note would have been payable in the funds, or currency generally received in payment of debts at the date of its maturity, precisely according to its present conditions, so that, really, the contract between the parties is the same, with or without this stipulation. It is urged by counsel, that this is a note of "risks." This is not conceded. Were it so, circumstances, as before suggested, might have made it payable in gold, dollar for dollar, according to its face. The true construction of the proviso, as to the funds in which the note was payable, doubtless is, that it was inserted to prevent a demand for payment in gold or its equivalent. If this were so, the protection should be reciprocal. The note, then, was not one of mutual risks, as contended, but of protection to the borrower. If it were a transaction of chances, it would have been so talked, and agreed, and the note would have been drawn accordingly.

The discussion, however, need not be protracted. The argument recurs, that this belongs to a class of exceptional cases, and is dealt with accordingly. The contract of the parties, as understood and construed, is not ignored nor violated by the judgment of this court. So far from it, the real intent of the parties is believed to be thereby most nearly arrived at. At all events, according to the best lights, and as nearly as human judgment is capable, justice has been done between the parties.

Re-argument refused.